**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

ATLANTIC SPECIALTY INSURANCE
COMPANY, a New York corporation, et
al.,

                            Plaintiffs,
      v.

JAY THOMASSEN, an individual and
Alaska resident,

                            Defendant.

Case No. 1:15-cv-00009-SLG

## ORDER RE PENDING MOTIONS

Before the Court at Docket 18 is Defendant Jay Thomassen's Motion for Summary

Judgment. Plaintiffs Atlantic Specialty Insurance Company, Travelers Property Casualty

Company of America, Navigators Insurance Services of Washington, Inc., and Great

American Insurance Company (collectively, Underwriters) filed an opposition and cross-

motion for summary judgment at Docket 21. Both motions are fully briefed. Also before

the Court, at Docket 22, is a motion to intervene filed by Yolanda Perez Orozco, a crew

member of the vessel at the center of this dispute.[1] Plaintiffs opposed that motion at

Docket 31; Ms. Perez replied at Docket 33. The Court heard oral argument on the

motions for summary judgment on March 31, 2016. Oral argument was not requested on

the motion to intervene, and was not necessary to the Court's determination of that issue.

//

//

---

[1] Yolanda Perez Orozco signed her declaration "Yolanda Perez" and refers to herself as Ms.
Perez. Docket 23-2 (Perez Decl.) at 3. The Court will do the same.

# BACKGROUND

Mr. Thomassen is the sole owner of Angelette, LLC.[2] Angelette, LLC, purchased the KUPREANOF, a 73-foot tender vessel, in March 2015.[3] On or about March 18, 2015, through an insurance agent, Sea-Mountain Insurance, Plaintiffs agreed to underwrite for Mr. Thomassen a marine insurance policy providing coverage for the KUPREANOF.[4] Mr. Thomassen is listed as the "Named Insured." The policy includes the following two provisions relevant to this dispute:

> **Layup Warranty**
> Vessel warranted laid up and out of commission from August 20 to June 20, annually. Permission granted to make alterations and repairs, to dock and undock, go on or off ways, gridirons and drydocks and to move about port for said purposes.

> ***Held Covered Clause:*** Held covered in respect to breach of trading warranty, and/or lay-up warranty provided Underwriters are advised within 72 hours from inception of the breach, at additional premiums, if any, to be determined by Underwriters.[5]

On or before June 6, 2015, Mr. Thomassen had hired a captain, Stephen Berry, and a crew that included Ms. Perez for the vessel's 2015 season.[6] In early June 2015, the vessel was in Petersburg, Alaska undergoing repairs at Piston and Rudder Services. On June 6, 2015, the vessel left Piston and Rudder Services and moved a few hundred

---

[2] Docket 12 (Answer) at 2.

[3] Docket 19-1 (Thomassen Aff.) at 2.

[4] Docket 1-1 (Insurance Policy) at 1.

[5] Docket 1-1 at 1, 13.

[6] Docket 21-4 at 1–8 (Berry Contract), 25–32 (Perez Contract). Mr. Berry's contract indicates a "Date of Hire" of June 1, 2015 but a signature date of June 6, 2015. The date of hire on Ms. Perez's contract indicates "8-22-68" with a signature date of June 6, 2015.

yards to the dock at Petro Marine Services in order to take on hydraulic fluid.[7]  The

KUPREANOF left the dock at Petersburg sometime in the morning of June 7, 2015.  The

precise time of the departure is disputed.  Plaintiffs assert "the KUPREANOF departed

Petersburg for Juneau at approximately 0400 on June 7, 2015 with Captain Berry and the

three crew members."[8]  In support of this position, Plaintiffs cite to a copy of a U.S. Coast

Guard Report of Marine Casualty Form 2892 that states the departure was at "6/7 4:AM."[9]

Mr. Thomassen has stated that he "was not at the dock at the time" and "[o]n information

and belief, according to Captain Berry, the Vessel left Petersburg dock as late as 8:00

a.m. or 9:00 a.m. or later Alaska time and not at '4 AM' as stated on the Coast Guard

Form 2892."[10]  Ms. Perez's declaration in support of her motion to intervene states the

"KUPREANOF left the dock on June 7, 2015 at around 0800 ADT. . . .  We left the waters

of the Petersburg area around 0830 ADT."[11]

Early in the day on June 10, 2015, the vessel sank, although all crewmembers

were successfully rescued.  Captain Berry informed Mr. Thomassen of the sinking, and

Mr. Thomassen has indicated that he was not aware of any potential breach of the

---

[7] *See* Docket 25-2 (Defendant's Response to Plaintiffs' First Discovery to Defendant) at 4.

[8] Docket 21 (Plaintiffs' Opp'n & Mot.) at 3.

[9] Docket 25-5 (Coast Guard Report) at 1.

[10] Docket 25-2 at 4.

[11] Docket 23-2 (Perez Decl.) at 2.  It is true that Mr. Thomassen did not refer to this declaration (indeed, it had not yet been made) in his initial motion for summary judgment.  But he did refer to it in his opposition to Plaintiffs' cross motion for summary judgment.  *See* Docket 24 at 16.  In any event, while a district court is obligated to consider "the papers submitted on the motion and such other papers as may be on file and specifically referred to and facts therein set forth in the motion papers," it "has discretion in appropriate circumstances to consider other materials."  *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

insurance policy prior to that point.[12]  All parties agree that Mr. Thomassen notified the Underwriters (through Sea-Mountain) of the sinking at 8:04 a.m. Alaska time.[13]

Plaintiffs filed suit on August 25, 2015, seeking a declaratory judgment that there is no coverage under the policy for hull or protection and indemnity (P&I) claims because the KUPREANOF and crew claims arise "from the sinking on June 10, 2015 that occurred in breach of the lay-up warranty."[14]  Several months later, on November 19, 2015, Mr. Thomassen wrote to Sea-Mountain, "I advised Underwriters via your office of the breach within 72 hours from inception of the breach of the lay-up warranty.  Would you discuss with the Underwriters what 'additional premiums, if any, to be determined by Underwriters' are required to be forwarded by me to continue coverage?"[15]  One of the Underwriters responded on December 7, 2015 that "[w]ith respect to the question regarding additional premium pursuant to the held covered provision of the policy, Counsel has determined factually that there was no notice of the breach within the 72 hours after inception.  We

---

[12] *See* Docket 19-1 (Thomassen Aff.) at ¶ 13.

[13] Mr. Thomassen states that, after learning of the sinking from Captain Berry, he left a message with Sea-Mountain that same day at or about 8:04 a.m. Alaska time, "providing notice that the Vessel sank and everyone got off safely."  Docket 19-1 (Thomassen Aff.) at 3.  Plaintiffs concur in the timing of this notice: "Underwriters were not advised that the vessel was 'in commission' and therefore not laid up until 0804 Alaska time on June 10, 2015; at that time, Underwriters were informed that the vessel sank in deep waters in the Gulf of Alaska." Docket 21 (Plaintiffs' Opp'n & Mot.) at 19.

[14] Docket 1 (Compl.) at 5.

[15] Docket 19-1 at 8 (Thomassen letter dated November 19, 2015); *see also* Docket 1-1 (Insurance Policy) at 13 (providing for payment of additional premiums when held covered clause is invoked).

will pass the assured's inquiry to underwriters with Counsel's comments in that regard."[16] The parties' cross-motions for summary judgment followed.

## DISCUSSION

### I. Jurisdiction

Plaintiffs have designated this as a suit in admiralty under Federal Rule of Civil Procedure 9(h), and Defendant agrees that the Court has original admiralty jurisdiction pursuant to 28 U.S.C. § 1333. The Court also has jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000, and under 28 U.S.C. § 2201, the Declaratory Judgment Act.

### II. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) directs a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The burden of showing the absence of a genuine dispute of material fact lies with the moving party.[17] If the moving party meets this burden, the non-moving party must present specific factual evidence demonstrating the existence of a genuine issue of fact.[18] The non-moving party may not rely on mere allegations or denials.[19] Rather, that party must demonstrate that enough

---

[16] Docket 19-1 at 5 (Underwriter e-mail dated December 7, 2015).

[17] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[18] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

[19] *Id.* at 248–49.

evidence supports the alleged factual dispute to require a finder of fact to make a determination at trial between the parties' differing versions of the truth.[20]

When considering a motion for summary judgment, a court views the facts in the light most favorable to the non-moving party and draws "all justifiable inferences" in the non-moving party's favor.[21] When faced with cross-motions for summary judgment, a court "review[s] each separately, giving the non-movant for each motion the benefit of all reasonable inferences."[22] To reach the level of a genuine dispute, the evidence must be such "that a reasonable jury could return a verdict for the non-moving party."[23] If the evidence provided by the non-moving party is "merely colorable" or "not significantly probative," summary judgment is appropriate.[24]

## III. Applicable Law

Here, the parties dispute the meaning of two clauses in the marine insurance policy: the lay-up warranty and the held covered clause. To interpret these disputed terms, the Court must first determine whether to apply state or federal law.[25] The general rule is that courts "apply state law unless an established federal rule address[es] the

---

[20] *Id.* (citing *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253 (1968)).

[21] *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).

[22] *Flores v. City of San Gabriel*, 824 F.3d 890, 897 (9th Cir. 2016) (citing *Ctr. for Bio–Ethical Reform, Inc. v. L.A. Cty. Sheriff Dep't*, 533 F.3d 780, 786 (9th Cir. 2008)).

[23] *Anderson*, 477 U.S. at 248.

[24] *Id.* at 249.

[25] *See Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 313–14 (1955).

issues raised, or there [is] a need for uniformity in admiralty practice."[26] "In *Wilburn Boat Co. v. Fireman's Fund Insurance Co.*, the Supreme Court declared that no established federal rule addressed marine insurance policy warranty clauses, and that the clauses should be interpreted using state law."[27] Therefore, the Court will apply Alaska law to the lay-up warranty.[28]

As to the held covered clause, Plaintiffs contend that state law also controls.[29] But Mr. Thomassen urges the Court to find that there is "judicially established and entrenched federal admiralty law" that continues coverage pursuant to a held covered clause so long as the owner notifies the insurer of the breach promptly upon learning of the breach, and pays an additional premium.[30] Mr. Thomassen extrapolates this proposed federal rule from a collection of federal cases interpreting held covered clauses. But those held covered clauses contain language quite different from the language at issue here. For example, in *Kalmbach, Inc. v. Insurance Co. of the State of Pennsylvania, Inc.*, the first

---

[26] *Yu v. Albany Ins. Co.*, 281 F.3d 803, 808 (9th Cir. 2002).

[27] *Guam Indus. Servs., Inc. v. Zurich Am. Ins. Co.*, 787 F.3d 1001, 1004 n.1 (9th Cir. 2015).

[28] *See id.* The Court is aware that the Ninth Circuit did not disclaim the existence of a federal "strict compliance" rule regarding maritime insurance warranties in either *Guam Indus. Servs.* or *Yu.* But neither did the Ninth Circuit hold that such a rule existed and displaced state law on the matter. In both cases, the Court emphasized that there was no conflict with state law and so it did not need to decide whether a federal rule applied or even existed. *See Guam Indus. Servs.*, 787 F.3d at 1004; *Yu*, 281 F.3d at 808–09. The Circuit Court applied the majority rule of strict compliance that it concluded would be followed in both Guam, *see Guam Indus. Servs.*, 787 F.3d at 1005, and Hawaii, *see Yu*, 281 F.3d at 809.

[29] *See* Docket 21 (Plaintiffs' Opp'n & Mot.) at 9.

[30] Docket 24 (Defendant's Reply) at 11 & n.3 (citing *Hilton Oil Transport v. Jonas*, 75 F.3d 627, 630 (11th Cir. 1996)); Docket 19 (Defendant's Mem.) at 14 (citing *Campbell v. Hartford Fire Ins. Co.*, 533 F.2d 496 (9th Cir. 1976)).

of the cases Mr. Thomassen relies on, the Ninth Circuit applied "local" law—relying on state law authorities from both California and Alaska—"because both parties urge us to do so, and because there is no statutory or judicially established federal admiralty rule governing the provisions in question."[31] Accordingly, *Kalmbach* does not establish any federal rule for the interpretation of held covered clauses. Nor does *Campbell v. Hartford Fire Insurance Co.*,[32] also cited by Mr. Thomassen. In *Campbell*, the parties stipulated that coverage under the policy should be governed by English law, and the court then relied on English authorities to interpret the held covered clause.[33]

Mr. Thomassen also cites *Northwestern National Insurance Co. v. Federal Intermediate Credit Bank of Spokane*, in which the Ninth Circuit held that, consistent *Kalmbach*, "[w]hen the held-covered clause is unambiguous, courts must apply it as written."[34] Based on the unambiguous terms of that particular held covered clause, the Court of Appeals held that "[e]ven if the assured does not notify the insurer until after the loss, the held-covered clause extends coverage, provided the assured did not know of the breach before that time."[35] But the outcome in that case derived not from an "established and entrenched federal admiralty rule," but instead from the explicit and

---

[31] 529 F.2d 552, 555 (9th Cir. 1976).

[32] 533 F.2d 496 (9th Cir. 1976).

[33] *Id.* at 497–98.

[34] 839 F.2d 1366, 1368 (9th Cir. 1988) (citing *Kalmbach*, 529 F.2d at 556).

[35] *Id.* at 1368.

unambiguous terms of the contract.[36] *Northwestern* does not support the existence of an established federal rule.[37]

Finally, Mr. Thomassen cites to *Hilton Oil Transport v. Jonas*, in which the Eleventh Circuit observed that "in the absence of a 'held covered' clause, federal admiralty law, not state law, would control."[38] Here, in the contract before the Court, there is a held covered clause. Thus, even if the Ninth Circuit were to follow the Eleventh Circuit's approach, the *Hilton* rule would not apply.

The Court is not persuaded that Mr. Thomassen's proposed rule is an "established federal rule" that should be applied in this case. If the cases cited by Mr. Thomassen support any federal rule, it is that marine insurance held covered clauses should be interpreted according to their terms. And Congress has expressly discouraged federal, as opposed to state, regulation of insurance.[39] Accordingly, under the presumption that state law applies established by *Wilburn Boat* and under Ninth Circuit precedent, the

---

[36] The clause at issue in *Northwestern* reads: "The Vessel is held covered in case of any breach of conditions as to cargo, trade, locality, towage or salvage activities, or date of sailing, or loading or discharging cargo at sea, provided (a) notice is given to the Underwriters immediately following receipt of knowledge thereof by the Assured, and (b) any amended terms of cover and any additional premium required by the Underwriters are agreed to by the Assured." *Id.* at 1367.

[37] Indeed, the *Northwestern* court did not discuss the choice-of-law issue at all in this context. The court did consider—and reject—the existence of a federal rule to govern whether the insurance broker was an agent of the marine insurer such that notice to the broker satisfied the held covered clause's notice requirement. *Id.* at 1368–69.

[38] 75 F.3d 627, 630 (11th Cir. 1996).

[39] McCarran Act of 1945, 15 U.S.C. § 1011–12. *Cf.* Rhea D. Pappas-Ward, *Strict Compliance with Marine Insurance Contracts: Conflicting Rules in the Ninth Circuit*, 70 Wash. L. Rev. 519, 535 (1995) ("State insurance laws are one example of an area where Congress has expressly mandated that comprehensive state regulation is preferable to national insurance laws. However, the Supremacy Clause still prevents even permissible state regulation from displacing established federal admiralty law.").

Court will apply Alaska's interpretive framework to the held covered clause at issue in this case as well as to the lay-up warranty.

## IV.     Interpretation of the Policy

### a.     General Principles of Alaska Insurance Law

Under Alaska law, "[t]he construction of an insurance contract is a matter for the court, unless its interpretation is dependent upon the resolution of controverted facts."[40] The Alaska Supreme Court has observed that "[t]he first and generally most important rule is that '[w]ords and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight."[41] But "insurance policies are contracts of adhesion and must be interpreted according to the reasonable expectations of the insured."[42] "To determine the parties' reasonable expectations, we examine (1) the language of the disputed policy provisions; (2) the language of other provisions in the same policy; (3) extrinsic evidence; and (4) case law interpreting similar provisions."[43] "When the language of a contract provision is unambiguous, we determine 'the parties' intention from the instrument itself.'"[44] "[W]here a clause in an insurance policy is ambiguous in the sense that it is reasonably susceptible

---

[40] *O'Neill Investigations, Inc. v. Illinois Emp'rs. Ins. of Wausau*, 636 P.2d 1170, 1173 (Alaska 1981).

[41] *Estate of Polushkin ex rel. Polushkin v. Maw*, 170 P.3d 162, 168 (Alaska 2007) (citing Restatement (Second) of Contracts § 202(1) (1981)).

[42] *Attorneys Liab. Prot. Soc'y, Inc. v. Ingaldson Fitzgerald, P.C.*, 370 P.3d 1101, 1108 (Alaska 2016).

[43] *Devine v. Great Divide Ins. Co.*, 350 P.3d 782, 786 (Alaska 2015).

[44] *Ellingstad v. State, Dep't of Nat. Res.*, 979 P.2d 1000, 1004 (Alaska 1999) (quoting *Klosterman v. Hickel Inv. Co.*, 821 P.2d 118, 124 (Alaska 1991)).

to more than one interpretation, we accept the interpretation that most favors the insured."[45] And "'[a]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.'"[46]

### b. Lay-up Warranty

The lay-up provision consists of two sentences. The first sentence is "Vessel warranted laid up and out of commission from August 20 to June 20, annually." Neither party seems to assert that this sentence is ambiguous, and the Court finds it clear: to be covered under the policy, the default status of the KUPREANOF from August 20 to June 20 is meant to be "removed from active operation or navigation."[47]

The second sentence is "Permission granted to make alterations and repairs, to dock and undock, go on or off ways, gridirons and drydocks and to move about port for said purposes." The parties dispute the meaning of this provision, but "[t]he fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous."[48]

Defendant's position appears to be that he could reasonably interpret this provision to allow the vessel to transit from Petersburg to Juneau and head to the fishing grounds,

---

[45] *Kalenka v. Infinity Ins. Cos.*, 262 P.3d 602, 607 (Alaska 2011) (quoting *C.P. ex rel. M.L. v. Allstate Ins. Co.*, 996 P.2d 1216, 1222 (Alaska 2000)).

[46] *Polushkin*, 170 P.3d at 172 (quoting Restatement (Second) of Contracts § 203(a) (1981)).

[47] *See Glossary of Marine Insurance and Shipping Terms*, 14 U.S.F. Mar. L.J. 305, 369 (2002) (defining "Laid-Up" as "[a] vessel removed from active operation or navigation.").

[48] *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir. 1989) (quoting *Int'l Union of Bricklayers & Allied Craftsman Local No. 20 v. Martin Jaska, Inc.*, 752 F.2d 1401, 1406 (9th Cir. 1985)).

all without breaching the lay-up warranty.[49] This is not a reasonable interpretation of the "permission granted" clause because it entirely swallows up the "laid-up" provision: the KUPREANOF would be covered year-round, in and out of port, virtually without limit. Mr. Thomassen could not have a reasonable expectation that this policy would provide such extensive coverage when the policy specifies that the KUPREANOF is to be "laid up and out of commission" for ten months of the year.

Plaintiffs offer their own equally unconvincing interpretation. They argue that it does not matter what time the vessel left the dock on June 7 because, under their interpretation of the "permission granted" clause, the vessel was already in breach on June 6.[50] Plaintiffs assert that under the "permission granted clause" "the only permitted activity was making alterations and repairs,"[51] such that the vessel was no longer laid up once its repairs were completed and it had started getting ready to leave Petersburg. In Plaintiffs' view, "[w]hen the KUPREANOF left Piston and Rudder Services on June 6, 2015 and docked at Petro Marine Services in Petersburg where hydraulic oil was put in the tank, it was not docking or moving about the port for the purpose of making alterations and repairs."[52] Plaintiffs assert that "it cannot be reasonably disputed that the vessel was not 'laid up and out of commission' where it was moored with fuel and a full crew ready

---

[49] Mr. Thomassen averred that "I believe that the activities of the T/V KUPREANOF on and around June 7 to June 10 generally complied with the general activities described and allowed in the 'Layup Warranty.'" Docket 19-1(Thomassen Aff.) at 2. *See also* Docket 21-2 at 4.

[50] Docket 32 (Plaintiff's Reply) at 8-10.

[51] Docket 32 at 8.

[52] *Id.*

for the imminent voyage to Juneau on the morning of June 7th."[53]  But, in light of the permission granted clause, "laid up and out of commission" is not the only status allowed of the vessel during the lay-up period.[54]

The Court finds the "permission granted" provision unambiguous.  It uses three distinct infinitives to permit three distinct classes of activity.  The policy first provides permission "to make alterations and repairs."  Second, it provides permission "to dock and undock, go on or off ways, gridirons and drydocks."  And third, it provides permission "to move about port for said purposes," that is, for the purposes of "mak[ing] alterations or repairs" *or* "dock[ing] and undock[ing], go[ing] on or off ways, gridirons and drydocks."[55]

---

[53] Docket 32 (Plaintiffs' Reply) at 8.  Plaintiffs urge the Court to adopt a crew hire date of June 1, 2016 as the "date the vessel was no longer 'laid up.'"  Docket 21 (Plaintiffs' Opp'n & Mot.) at 13 & n.2.  But the policy permits certain operations within the port such that Mr. Thomassen could reasonably expect the policy allows a crew to operate the vessel in conformity with the permission granted clause.

[54] Plaintiffs maintain that "had a crew member suffered injury at any time between June 1, 2015 and the sinking, this court would surely conclude that the vessel was 'in navigation' for purposes of seaman status under the Jones Act.  The vessel cannot be both 'laid up and out of commission' and 'in navigation' at the same time."  Docket 21 (Plaintiffs' Opp'n & Mot.) at 18; *see also* Docket 23 (Mem. ISO Mot. to Intervene) at 6-7 n.18.  But the Court need not decide when a vessel is "in navigation" for the purposes of the Jones Act because it has no bearing on whether the vessel was in compliance with the lay-up warranty.

[55] Neither party has presented definitions of the terms "ways," "gridirons," or "drydocks" as used in the "permission granted" clause.  In the marine insurance context, "ways" means "[t]he framework on which a vessel is built and from which it slides into the water upon launching."  *See Glossary of Marine Insurance and Shipping Terms*, 14 U.S.F. Mar. L.J. 305, 421 (2002); *see also Way*, 20 THE OXFORD ENGLISH DICTIONARY 17 (2nd Ed. 2001) (In nautical terms, "*Ways*, balks laid down for rolling weights along.  *Launching ways*, two parallel platforms of solid timber, one on each side of the keel of a vessel while building, and on which her cradle slides on launching.").  A *gridiron* in this context is "[a] heavy framework of beams in parallel open order (suggesting a gridiron) used to support a ship in dock."  4 THE OXFORD ENGLISH DICTIONARY 1092 (2nd Ed. 2001).  A *drydock* is "[a] dock from which the water is or may be let out, for repairing (or building) a ship."  6 THE OXFORD ENGLISH DICTIONARY 834 (2nd Ed. 2001).  *Accord* INTERNATIONAL MARITIME DICTIONARY 438 (Launching Ways); 904 (Ways); 338 (Gridiron); 246 (Dry Dock) (2nd Ed. 1961).

Plaintiffs' interpretation is unreasonable because it would deny permission to move the vessel to and from the designated locations within the port—docks, ways, gridirons, and drydocks—unless that movement was for the purpose of making alterations and repairs.[56] Contrary to Plaintiffs' argument, the policy necessarily permits receiving fuel and hydraulic oil because—if the vessel may move about the port for the stated purposes—Mr. Thomassen could reasonably expect the policy allows him to keep the vessel operational. Moreover, the clause expressly grants permission "to dock" and "to move about port" for the purpose of docking—precisely what the vessel did when it left Piston and Rudder Services and docked at Petro Marine Services on June 6, 2015.

The Court finds that the lay-up warranty would be breached when the vessel left a particular location for any purpose other than (1) to make alterations and repairs, or (2) to dock and undock, or to go on or off ways, gridirons, and drydocks within the port. For example, the vessel could move about port as necessary to conduct repairs or alterations, such as when testing newly installed equipment. Or, the vessel could be taken out of a drydock and moved to a dock within the same port when—repairs completed—the drydock was needed for another vessel. There would be no breach if the vessel relocated from Dock A to Dock B within the same port when directed to do so by the port operators, even if such movement was not related to alterations or repairs. And, based on the current record, there was no breach when, on June 6, 2015, the vessel "move[d] about port" "to dock" at Petro Marine Services. But it would violate the lay-up warranty when

---

[56] In essence, Plaintiffs ask the Court to read the provision as "Permission granted to make alterations and repairs, <u>and</u> to dock and undock, go on or off ways, gridirons and drydocks and ~~to~~ move about port for said purposes."

the vessel left a dock in Petersburg for the purpose of heading out to sea, even when it was still within the harbor, because such movement would not be one of the permitted activities in the permission granted clause. Thus the lay-up warranty would be breached when the vessel moved about the port—that is, at the moment the last line was cast away—for purposes other than of making alterations or repairs, docking or undocking, or going on or off ways, gridirons, or drydocks within the same port.

### c. Held Covered Clause

The policy provides that the KUPREANOF is "[h]eld covered in respect to breach of trading warranty, and/or lay-up warranty provided Underwriters are advised within 72 hours from inception of the breach, at additional premiums, if any, to be determined by Underwriters."[57] Mr. Thomassen asserts that "[e]very interpretation of a 'held covered' clause states that the owner must not be aware of a breach and then, when the owner is aware of a breach, must provide immediate notice to underwriters."[58] But "[a] typical [held covered] clause is as follows: . . . The Vessel is held covered . . . provided (a) notice is given to the Underwriters immediately following receipt of knowledge thereof by the assured . . . ."[59] The held covered clause in this case is not typical, as it contains no such provision. Plaintiffs correctly assert that, in this case, "the held covered clause does not require notice only after 'becoming aware' of the event and does not require privity on the part of the owner. Rather, the held covered clause extends coverage in the event of a

---

[57] Docket 1-1 (Insurance Policy) at 13.

[58] Docket 24 (Defendant's Reply) at 10.

[59] Thomas J. Schoenbaum, Admiralty & Maritime Law 448 (5th ed. 2011).

breach of the lay-up warranty 'provided Underwriters are advised within 72 hours from inception of the breach.'"[60]  By the policy's plain and unambiguous terms, the KUPREANOF was covered under the policy only if the Underwriters were notified within 72 hours of the precise time a breach of the lay-up warranty began, without regard to when Mr. Thomassen learned of the breach.

## V.  Application

Applying the foregoing interpretation of the policy, it is clear that a genuine dispute of material fact precludes summary judgment for either party.  Both parties agree that the Underwriters were notified that the vessel had sunk on the open seas, and thereby informed that the vessel had not been laid up, at 8:04 a.m. Alaska time on June 10, 2015.[61]  Under the contract, as explained above, this notification properly invoked the held covered clause only if the breach began not more than 72 hours prior to that time.[62] That breach, as explained above, occurred when the vessel left the dock in Petersburg to begin transit to Juneau.  The essential question, then, is whether the vessel left the dock before or after 8:04 a.m. on June 7, 2015.

There is a genuine dispute between the parties as to when, precisely, the vessel cast off.  If the KUPREANOF left the dock headed for open water at or after 8:04 a.m. Alaska time, the June 10 notice was sufficient to invoke the held covered clause.  If the vessel cast off before 8:04 a.m. on June 7, 2015, then the notice requirement of the held

---

[60] Docket 21 (Plaintiffs' Opp'n & Mot.) at 13.

[61] Docket 21 at 19; Docket 19-1 (Thomassen Aff.) at 3.

[62] The Court interprets "within" to include the full 72 hours as "the interpretation that most favors the insured."  *Kalenka*, 262 P.3d at 607 (quoting *C.P. ex rel. M.L.*, 996 P.2d at 1222).

covered clause was not met. Plaintiffs have asserted, relying on an official document filed by Captain Berry with the U.S. Coast Guard, that "the KUPREANOF departed Petersburg for Juneau at approximately 0400 on June 7, 2015."[63] Mr. Thomassen responded to an interrogatory that "[o]n information and belief, according to Captain Berry, the Vessel left the Petersburg dock as late as 8:00 a.m. or 9:00 a.m. or later Alaska time and not at '4 AM' as stated on the Coast Guard Form 2892,"[64] and Ms. Perez stated in her declaration that "KUPREANOF left the dock on June 7, 2015 at around 0800 ADT."[65]

Both motions for summary judgment will be denied because the evidence as to when precisely the breach began is such that a reasonable jury could return a verdict for either party.

## VI.   Motion to Intervene

Ms. Perez seeks to intervene under Rule 24, and her memorandum in support of that motion focuses on intervention as of right.[66] Mr. Thomassen did not respond to Ms. Perez's motion. Plaintiffs oppose the motion and dispute each element of the test for intervention.[67]

---

[63] Docket 21 at 3.

[64] Docket 25-2 (Defendant's Response to Plaintiffs' First Discovery to Defendant) at 4.

[65] Docket 23-2 (Perez Decl.) at 2.

[66] Docket 22 (Mot. to Intervene); Docket 23 (Mem. in Support of Mot. to Intervene).

[67] *See* Docket 31 (Opp'n).

### a. Intervention as of Right

Federal Rule of Civil Procedure 24(a)(2) gives a person a right to intervene when "[o]n timely motion," the applicant "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." "The Ninth Circuit requires an applicant for intervention as of right under Fed. R. Civ. P. 24(a)(2) to demonstrate that (1) it has a significant protectable interest relating to the property or transaction that is the subject of the action; (2) the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; (3) the application is timely; and (4) the existing parties may not adequately represent the applicant's interest."[68] "Each of these four requirements must be satisfied to support a right to intervene."[69] "While Rule 24 traditionally receives liberal construction in favor of applicants for intervention, it is incumbent on the party seeking to intervene to show that all the requirements for intervention have been met."[70]

"An applicant for intervention has a significantly protectable interest if the interest is protected by law and there is a relationship between the legally protected interest and the plaintiff's claims."[71] A "specific legal or equitable interest" is not required, and it is

---

[68] *Chamness v. Bowen*, 722 F.3d 1110, 1121 (9th Cir. 2013) (citing *United States v. Alisal Water Corp.*, 370 F.3d 915, 919 (9th Cir. 2004)).

[69] *Id.* (quoting *Arakaki v. Cayetano*, 324 F.3d 1078, 1083 (9th Cir. 2003)).

[70] *Id.* (internal quotation marks, formatting, and citations omitted).

[71] *Alisal Water Corp.*, 370 F.3d at 919.

"generally enough that the interest is protectable under some law, and that there is a relationship between the legally protected interest and the claims at issue."[72]  Ms. Perez asserts that the insurance "policy at issue contains provisions of direct interest and obligations regarding the no-fault cure claims of the crew of the vessel KUPREANOF."[73]  Plaintiffs maintain that Ms. Perez's "contingent economic interest in insurance policy proceeds is insufficient to satisfy the [protectable interest] requirement for intervention as of right."[74]  They maintain that she "is not an intended beneficiary of the insurance policy and she may not sue to enforce the insurance contract."[75]

Ms. Perez's interest in the outcome of this litigation is in obtaining a source of funds for any future cure that she may be awarded.[76]  She does not have an independent interest in the contractual relationship between Mr. Thomassen and Plaintiffs.  Ms. Perez may or may not obtain a judgment on her cure claims, and the outcome of this case may impact the likelihood of her collecting on such a judgment.  But the Ninth Circuit has held

---

[72] *Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173, 1179 (9th Cir. 2011) (en banc) (citations omitted).

[73] Docket 22 (Mot. to Intervene) at 2.  "Cure" is the right of certain maritime workers (known as "seamen" in admiralty law) to necessary medical services, protected by the general maritime law.  *See* THOMAS J. SCHOENBAUM, 1 ADMIRALTY AND MARITIME LAW 505, 522 (5th Ed. 2011).  The policy provision here provides that "this Company hereby undertakes to pay up to the amount hereby insured . . . such sums as the Assured . . . shall have become legally liable to pay and shall have paid on account of . . . Hospital, medical, or other expenses necessarily and reasonably incurred in respects of loss of life of, injury to, or illness of any member of the crew of the vessel named herein."  Docket 23-1 at 10, lines 10-16.  The Court assumes without deciding that this provision refers to any maintenance and cure claims of the type Ms. Perez may be asserting.

[74] Docket 31 (Opp'n) at 6.

[75] Docket 31 at 11.

[76] *See* Docket 23 at 9 ("Ms. Perez' interest in the policy for payment of her medical expenses is clear.")

that "an allegedly impaired ability to collect judgments arising from past claims does not, on its own, support a right to intervention."[77]

Ms. Perez argues that "[u]nlike a standard tort victim, Ms. Perez is an intended beneficiary under the subject policy."[78]   But there is nothing in the policy itself that distinguishes between a tort claimant and a cure claimant.  Coverage for both types of claims is detailed in the P&I Clauses, and are subject to the same requirements.[79]

Ms. Perez argues that she will "suffer a practical impairment of [her] interests" if Plaintiffs prevail, and that this is a sufficient interest for intervention purposes.[80]   But to satisfy this test, Ms. Perez must show that she will suffer a practical impairment to an "interest" that is protectable.  Ms. Perez's protectable interest is her legal right to seek cure.  But the outcome of this litigation will have no practical impact on that protectable interest.

The Ninth Circuit caselaw on this point illustrates the distinction.  In *California ex rel. Lockyer v. United States*, the case on which Ms. Perez relies, California challenged

---

[77] *United States v. Alisal Water Corp.*, 370 F.3d 915, 919-20 (9th Cir. 2005) (denying a judgment creditor the right to intervene in an environmental civil enforcement action brought by the United States against the debtor because "the prospective collectability of a debt . . . is several degrees removed from the overriding public health and environmental policies that are the backbone of this litigation"); *cf. Cal. Edison Co. v. Lynch*, 307 F.3d 794, 803 (9th Cir. 2002) (finding that "a contingent, unsecured claim against a third-party debtor" did not support intervention).

[78] Docket 23 at 2.

[79] *See* Docket 23-1 at 10-11. Ms. Perez is correct that proving up a claim for maintenance and cure is less of a burden than proving up a negligence claim.  *See* Docket 33 at 7-8.  But liability is not automatic.  As discussed below, Ms. Perez still must prove both that she was a seaman and that she was injured while in service of the ship.

[80] Docket 23 at 9 (quoting *California ex rel. Lockyer v. United States*, 450 F.3d 436, 441 (9th Cir. 2006)).

the constitutionality of a federal statute designed to "keep doctors who have moral qualms about performing abortions from being put to the hard choice of acting in conformity with their beliefs, or risking imprisonment or loss of professional livelihood."[81]  Two groups of doctors sought to intervene to defend the federal law; California and the United States opposed intervention.  The Ninth Circuit reversed the district court's denial of intervention as of right.  The Circuit Court reasoned that the challenged law "provides an important layer of protection" for the doctors and that its invalidation would necessarily impair that interest.  And the court distinguished *Donnelly v. Glickman*, in which the Ninth Circuit denied the intervention of male Forest Service employees in a discrimination suit brought by female employees because "the fate of the women's claims wouldn't affect the men's claims at all."[82]  Ms. Perez's interest falls closer to *Donnelly*: the fate of the Underwriters' and Mr. Thomassen's claims in this action won't affect the validity of her legal claims for cure.

The Ninth Circuit's reasoning in *United States v. Aerojet General Corp.* also reveals the limits of the "practical impairment" test.[83]  In that case, the Court of Appeals held that parties potentially liable for cleanup costs under federal environmental laws could intervene as of right in other parties' consent decree proceedings.  The applicable statutes would permit the intervenors to seek contribution from the settling parties, but also permitted the United States to effectively immunize parties who entered consent

---

[81] *Lockyer*, 450 F.3d at 441.

[82] *Lockyer*, 450 F.3d at 442 (citing *Donnelly v. Glickman*, 159 F.3d 405, 409-10 (9th Cir. 1998)).

[83] 606 F.3d 1142 (9th Cir. 2010).

decrees. The Circuit Court rejected the argument that because the intervenors had not yet incurred liability on which to seek contribution, their interest was too speculative. The court reasoned that the intervenors' legally protected interest was their right to seek contribution from other responsible parties once they were sued, and that this right could be practically impaired by the proceedings: if the consent decree was approved, the intervenors' right to seek contribution from the settling parties would be extinguished.[84] Here, by contrast, the outcome of the litigation will have no impact on Ms. Perez's legal right to seek cure.

Ms. Perez does not have a significant protectable legal interest that is directly related to the insurance coverage dispute that is the subject of this action. Her protectable interest is the legal right to seek cure, and that right will not be directly impaired by the outcome of this litigation. Because "[f]ailure to satisfy any one of the requirements is fatal to the application" to intervene, the Court "need not reach the remaining elements . . . ."[85] The Court will not permit intervention as of right.

### b.    Permissive Intervention

Intervention under Federal Rule of Civil Procedure 24(b) is not entirely within the discretion of a district court. Rather, the movant must meet one of two sets of requirements before a court may permit intervention. Permissive intervention under Rule 24(b)(1)(A) may apply if a movant "is given a conditional right to intervene by a federal

---

[84] *See Aerojet General*, 606 F.3d at 1150-51.

[85] *Perry v. Proposition 8 Official Proponents*, 587 F.3d 947, 950 (9th Cir. 2009).

statute" fact."[86]  The Court is unaware of, and the parties have not pointed to, any federal statute that gives Ms. Perez a conditional right to intervene.  Accordingly, the Court will not permit intervention under Rule 24(b)(1)(A).

Alternatively, "[a] district court may grant permissive intervention under Federal Rule of Civil Procedure 24(b)(1)(B) where the applicant 'shows (1) independent grounds for jurisdiction; (2) the motion is timely; and (3) the applicant's claim or defense, and the main action, have a question of law or a question of fact in common.'"[87]  Ms. Perez's own claim is for maintenance and cure.[88]  To prevail on such a claim, Ms. Perez must show that she was a "seaman," that she was injured or became ill while in the service of the vessel, and the amount of maintenance and cure to which she is entitled.[89]  In the present action, the issues are only the scope of the insurer's contractual obligations to the insured, and, as explained above, whether and when the KUPREANOF was in breach of the applicable warranties.  There is no overlap of either law or fact between the claims in this action and the claims that Ms. Perez has brought (or might bring).  Accordingly, the Court will deny permissive intervention under Rule 24(b)(1)(B).

In light of the foregoing, Ms. Perez will not be allowed to intervene under Rule 24.

---

[86] Fed. R. Civ. P. 24(b)(1).

[87] *Perry*, 587 F.3d at 955 (quoting *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 839 (9th Cir. 1996), as amended on denial of reh'g (May 30, 1996)).

[88] Ms. Perez appears to concede that intervention cannot be premised on her other, "fault"-related claims.  *See* Docket 22 at 2; Docket 23 at 10.  In any event, none of those other claims raises any issue of law or fact common to this action.

[89] *See Lipscomb v. Foss Maritime Co.*, 83 F.3d 1106, 1109 (9th Cir. 1996); *see also Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 527-28 (1938) (discussing the origins of the right to maintenance and cure).

**CONCLUSION**

Therefore, IT IS ORDERED that Defendant's Motion for Summary Judgment at Docket 18, and Plaintiffs' Cross-Motion for Summary Judgment at Docket 21 are DENIED.  Ms. Perez's Motion to Intervene at Docket 22 is DENIED.

DATED this 6th day of September, 2016 at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE
